**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND; and ARTHUR H. BUNTE, JR., trustee, | ) ) ) ) | Case No. 15 C 10828 |
| *Plaintiffs,* | ) ) | Honorable Maria Valdez Magistrate Judge |
| v. | ) ) | |
| GREGORY STEPHENS, an individual; and SHERRY STEPHENS, an individual, | ) ) ) | |
| *Defendants.* | ) ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Defendant Gregory Stephens ("Gregory"), was the majority shareholder and president of Locker Moving & Storage, Inc. ("Locker"). From at least 2008 and continuing until it ceased operations in 2013, Locker faced financial difficulties and Gregory purportedly "loaned" monies to Locker to keep it afloat. In 2013, Locker sold all of its remaining assets and ceased operations. In 2014, Plaintiffs, Central States, Southeast and Southwest Areas Pension Fund (the "Fund") and Arthur H. Bunte, Jr., trustee (collectively the "Plaintiffs"), obtained a judgment against Locker in the amount of $641,887.63 for delinquent withdrawal liability. While attempting to collect the judgment, the Fund discovered that Gregory had caused Locker to transfer monies and assets to him and his spouse, Defendant Sherry Stephens ("Sherry" and together with Gregory collectively referred to as the "Stephenses"), in purported satisfaction of the "loans" he had made to Locker.

- 1 -

The material facts are undisputed and the evidence will show that: (1) Gregory's purported "loans" to Locker were in reality capital contributions; (2) the transfers by Locker to the Stephenses were fraudulent and should thus be voided; and (3) the transfers were entered into to evade or avoid withdrawal liability. For the reasons set forth below, Plaintiffs are entitled to summary judgment.

## FACTUAL BACKGROUND

### A.     The Parties.

The Fund is a multiemployer pension plan. (SMF 3, 6.)[1] Arthur H. Bunte, Jr. is a trustee of the Fund, and he and his fellow trustees are the plan sponsor of the Fund. (SMF 4.) Gregory and Sherry are married and reside in the State of Florida. (SMF 7-9.) Gregory was the president and 80% shareholder of Locker, which was a company organized under the laws of the State of Ohio. (SMF 10, 12.) Sherry was Locker's secretary, and was active in the day-to-day operations of the company until about 2009. (SMF 14.)

Prior to ceasing operations in 2013, Locker was in the business of moving and storing goods for both residential and commercial clients. (SMF 11, 17.) Locker was a party to collective bargaining agreements that covered its Teamster employees. (SMF 18.) Pursuant to those agreements, Locker was required to make pension contributions to the Fund on behalf of its covered employees. (SMF 18.)

### B.     Locker's Financial Difficulties and the Advances.

From at least 2008, Locker began having financial difficulties that became progressively worse during the years 2010-2013. (SMF 33.) From 2009 to 2013, Locker's gross receipts dropped from over $1 million in 2009 to only $260,000 in 2013, and Locker incurred significant

---

[1] Plaintiffs' L.R. 56.1(a)(3) Statement of Material Facts is referred to as "SMF __".

net operating losses in each of those years. (SMF 34-39.) Locker's bank became so concerned about its finances that it instructed Locker to improve its margins. (SMF 40-43.) As a result, in 2008, Locker was forced to sell the real property and self-storage units it owned at 5808 Fulton Road in Canton, Ohio (the "Fulton Road Property") for $960,000 in cash and a promissory note for $240,000 (the "Fulton Note"). (SMF 40.) But that sale did not cure Locker's financial difficulties. So at the insistence of its bank, in 2010, Locker sold its other remaining real property and self-storage units located at 131 Perry Drive NW in Canton, Ohio (the "Perry Drive Property"). (SMF 42-43.) By the end of 2011, Locker's remaining assets were valued at approximately $266,000.[2] (SMF 47.)

Even with the sale of the properties and the self-storage units, Locker continued to need more money to operate. (SMF 44, 52, 58.) But by 2008, Locker was unable to obtain financing from any lending institution because of its precarious financial condition. (SMF 52.) So from 2009 to 2013, Gregory transferred a total of $399,520 of his own funds into Locker's bank account to keep the company afloat (the "Advances"). (SMF 53.) Locker and Gregory never executed any instruments of indebtedness, security agreements, and/or any other documents in connection with the alleged Advances. (SMF 54.) Additionally, there was no schedule for repayment of the Advances, and Locker never paid Gregory any interest. (SMF 55-56.)

## C.    Locker's Withdrawal Liability.

While going through its financial difficulties, Locker knew that if it ever triggered a withdrawal from the Fund it would be assessed withdrawal liability. (SMF 19-22.) Indeed, in 2004, Gregory asked for and received an estimate of Locker's withdrawal liability because the

---

[2] Approximately $231,000 of the $266,000 was the amount remaining due on the Fulton Note. (SMF 47.)

company was considering withdrawing from the Fund. (SMF 19-20.) Ultimately, Locker elected to remain in the Fund because it could not afford to pay the withdrawal liability. (SMF 21.)

Even though Locker wanted to avoid triggering a withdrawal, it eventually triggered a partial withdrawal from the Fund on December 31, 2011, and was assessed $220,856.52 in withdrawal liability (the "2011 Assessment").[3] (SMF 23.) On or about May 16, 2013, Locker received a notice and demand for payment of the 2011 Assessment (the "2011 Notice"). (SMF 24.) On December 31, 2012, Locker triggered a second partial withdrawal from the Fund and was assessed $227,749.54 in withdrawal liability (the "2012 Assessment"). (SMF 25.) On or about December 6, 2013, Locker received a notice and demand for payment of the 2012 Assessment. (SMF 26.) Locker ceased operations in July 2013. (SMF 17.) As a result, on or about July 6, 2013, Locker triggered a complete withdrawal from the Fund and was assessed $76,486.98 in withdrawal liability (the "2013 Assessment"). (SMF 27.) On or about December 6, 2013, Locker received a notice and demand for payment of the 2013 Assessment. (SMF 28.)

After Locker failed to pay the withdrawal liability assessments, the Fund filed a lawsuit against Locker in a case entitled *Central States, Southeast and Southwest Areas Pension Fund, et al. v. Locker Moving and Storage, Inc.,* Case No. 14 C 0667 (N.D. Ill.), to collect the 2011 Assessment, the 2012 Assessment, and the 2013 Assessment (collectively the "Assessments"). (SMF 29.) On August 19, 2014, a judgment was entered against Locker in the total amount of $641,887.63 (the "Judgment"). (SMF 30.) To date, the Fund has been unable to collect on the Judgment. (SMF 31.)

---

[3] Locker triggered a partial withdrawal as a result of a decline in contributions to the Fund. *See* 29 U.S.C. § 1385(a)(1). A decline in contributions usually occurs when covered employees retire, quit, or are laid off, and are not replaced with new employees.

**D.      Locker's Transfers of Assets to the Stephenses.**

While attempting to collect the Judgment, the Fund discovered that during the period of January 2010 through December 2013, Gregory had caused Locker to transfer assets to the Stephenses purportedly in repayment of the Advances. (SMF 65-74.) From 2010 through 2013, Locker made cash transfers to Gregory in the total amount of $149,500, summarized as follows: (a) in 2010 – at least 2 transfers in the total amount of $100,000; (b) in March 2013 – 1 transfer in the amount of $2,000; (c) in April 2013 – 1 transfer in the amount of $10,000; (d) in May 2013 – 1 transfer in the amount of $12,500; (e) in July 2013 – 1 transfer in the amount of $15,000; (f) in August 2013 – 1 transfer in the amount of $6,000; (g) in October 2013 – 1 transfer in the amount of $2,000; and (h) in November 2013 – 1 transfer in the amount of $2,000. (SMF 65.) In June 2012, Locker also assigned the Fulton Note to the Sherry L. Stephens Revocable Trust. (SMF 66-70.) From 2012 to 2014, the Stephenses received an additional $235,821.64 from the payments on the Fulton Note. (SMF 72.) So in total, the Stephenses received a total of $385,321.64 in assets from Locker for "repayment" of the Advances (the "Transfers"). (SMF 74.) In addition to the Transfers, Gregory continued to receive a salary from Locker from 2009 to 2013. (SMF 64.) But his salary declined each year during that period.[4] (SMF 64.)

## ARGUMENT

**A.      The Fund Is Entitled to Summary Judgment on Count II Because the Advances Were Capital Contributions.**

Under Count II, the Fund alleges that the Stephenses received improper shareholder distributions in preference to creditors such as the Fund. Courts in this district have held that

---

[4] Since Locker's operations declined from 2009 to 2013, it is unsurprising that Gregory's salary also declined during that period. (SMF 34-39.)

"[w]hen the assets of a corporation are distributed to its shareholders leaving corporate debts unpaid, liability of the shareholders to a creditor, to the extent of the value of the assets received is beyond question." *Cent. States, Se. & Sw. Areas Pension Fund v. Minn. Van & Wrh. Co.*, 764 F. Supp. 1289, 1294 (N.D. Ill. 1991); *see also Cent. States, Se. & Sw. Areas Pension Fund v. Cardwell*, No. 12 C 7715, 2014 WL 2568471, at *4 (N.D. Ill. June 6, 2014) ("on dissolution of a corporation, its stockholders are entitled to receive only the remaining equity in their corporation, bearing personal responsibility to the corporate creditors for any corporate liabilities that should have been satisfied before the distribution of assets on dissolution"). This theory of recovery has been referred to as the "trust fund" theory and it means that shareholders are remaindermen and their interests extend only to what is left after all corporate obligations have been paid. *Minneapolis Van*, 764 F. Supp. at 1294. This doctrine has been applied to withdrawal liability cases under MPPAA. *Id*. Where appropriate, a court may use its equitable powers under ERISA, 29 U.S.C. § 1132(a)(3)(B), to impose a constructive trust for the benefit of a pension fund with respect to assets conveyed to the insolvent corporation's shareholders. *Id.*

Gregory argues that he was entitled to the Transfers because he was Locker's creditor by virtue of the purported "loans" he gave to the company. The Fund contends that the Transfers were improper shareholder distributions because the Advances were capital contributions – not loans. "The determination of whether advances to a corporation are loans or capital contributions depends on whether the objective facts establish an intention to create an unconditional obligation to repay the advances." *Roth Steel Tube Co. v. C. I. R.*, 800 F.2d 625, 630 (6th Cir. 1986). In determining whether advances to a company by a shareholder are loans or equity contributions, the courts have generally looked to the factors set forth in *Roth Steel*, which are discussed below.

1.      **There Were No Instruments Evidencing the Indebtedness.**

Here, it is undisputed that the Advances were undocumented. (SMF 54.) There were no promissory notes or security agreements. (SMF 54.) This factor weighs in favor of equity.

2.      **The Absence of a Fixed Maturity Date and Schedule of Payments.**

There was no fixed maturity date or a schedule of payments for repayment of the Advances. (SMF 55.) This factor weighs in favor of equity.

3.      **The Absence of a Fixed Rate of Interest and Interest Payments.**

"[A] true lender is concerned with interest." *Ellinger v. United States*, 470 F.3d 1325, 1335 (11th Cir. 2006) (quoting *Curry v. United States*, 396 F.2d 630, 634 (5th Cir. 1968)); *see also Texas Farm Bureau v. United States*, 725 F.2d 307, 314 (5th Cir. 1984). This is so because lenders make money on loans by collecting interest payments. Accordingly, the absence of interest payments is a "strong indication" that the advances were capital contributions. *Roth Steel*, 800 F.2d at 631. Here, there was no interest rate on the Advances, and Locker did not pay interest to Gregory. (SMF 56.) This factor weighs strongly in favor of equity.

4.      **The Source of Repayments.**

"If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution . . . [because] an expectation of repayment solely from the corporate earnings is not indicative of a bona fide debt . . ." *Roth Steel*, 800 F.2d at 631; *see also In the Matter of Larson*, 862 F.2d 112, 117 (7th Cir. 1988) (a true creditor expects repayment regardless of the company's success or failure, while the investor expects to be repaid only when the company is successful). Gregory admitted that he expected repayment only when Locker had cash available to do so. (SMF 57.) This factor weighs in favor of equity.

5.      **The Inadequacy of Capitalization.**

Inadequate capitalization is "strong evidence" that the advances are capital contributions. *Roth Steel*, 800 F.2d at 630. This is so because a true lender would not lend money unless it believes the borrower has the means and ability to repay the loan. *Bauer v. C. I. R.*, 748 F.2d 1365, 1369 (9th Cir. 1984). While the exact calculation of Locker's assets and liabilities as of each of the dates of the advances are unknown, Gregory testified that after 2008, Locker's financial condition was poor and that it had trouble paying its ongoing obligations. (SMF 33, 52, 58.) It is clear that without the Advances, Locker would not have been able to pay its bills and continue operating. This factor weighs in favor of equity.

6.      **The Identity of Interest Between the Creditor and Shareholder.**

As noted in *Roth Steel*, advances between a parent corporation and a subsidiary should be subject to "particular scrutiny" because "the control element suggests the opportunity to contrive a fictional debt." 800 F.2d at 630. This reasoning applies equally to the majority shareholder and controlling officer of a company. Here, Gregory was Locker's majority shareholder and principal officer when the Advances were made, and the remaining shareholder was not active in Locker's operations. (SMF 12-13, 15.) Due to this ownership structure, Gregory had the opportunity and means to contrive a fictional debt. This factor weighs in favor of equity.

7.      **The Lack of Security for the Advances.**

No security was provided for the Advances. (SMF 54.) This factor weighs in favor of equity.

8.      **The Inability to Obtain Financing From Outside Lending Institutions.**

Gregory testified that Locker was unable to obtain financing from outside lending institutions prior to the Advances because of its precarious financial condition. (SMF 52.) "The

fact that no reasonable creditor would have acted in the same manner . . . is strong evidence that the advances were capital contributions rather than loans." *Roth Steel*, 800 F.2d at 631. This factor weighs in favor of equity.

### 9. The Advances Were Subordinated to the Claims of Outside Creditors.

When it was still operating, Locker paid all other creditors ahead of repaying Gregory for the Advances. (SMF 59-60.) When Locker ceased operations in July 2013, Locker paid all of its unsecured creditors in full (except Gregory and the Fund). (SMF 60.) As such, Gregory did not consider himself on the same level as other unsecured creditors, and willingly subordinated his claim to that of other unsecured creditors. This does not resemble an arm's-length transaction because no bona fide lender would agree to the full payment of all unsecured creditor claims before its own unsecured claims were satisfied. *See Ret. Benefit Plan of Graphic Arts Int'l Union Local 20-B v. Standard Bindery Co.*, 654 F. Supp. 770, 773-74 (E.D. Mich. 1986) (noting that shareholders recognized that their advances were really capital when, at dissolution of company, they paid all other creditors, except the pension plan, before repaying themselves). This factor weighs in favor of equity.

### 10. The Advances Were Not Used to Acquire Capital Assets.

Locker used the Advances to pay outstanding bills and for its ongoing operations. (SMF 58.) This factor weighs in favor of debt.

### 11. The Presence or Absence of a Sinking Fund to Provide Repayments.

Gregory testified that Locker did not establish any kind of sinking fund for the purpose of paying off the Advances. (SMF 61.) This factor weighs in favor of equity.

As the Sixth Circuit stated, "[i]n essence, the more a stockholder advance resembles an arm's-length transaction, the more likely it is to be treated as debt." *Indmar Prods. Co. v. C.I.R.*,

444 F.3d 771, 777 (6th Cir. 2006). Here, a bona fide lender would never have agreed to lend money to Locker under the terms agreed to by Gregory. As the above analysis shows, 10 of the 11 factors favor a finding of equity for the Advances.

If the Court holds that the Advances were capital contributions, the Court should enter summary judgment in favor of the Fund on Count II for the entire amount of the Transfers (i.e. $385,321.64) since it is undisputed that Locker and Gregory were aware of Locker's contingent withdrawal liability to the Fund since 2004. (SMF 19-22.) *See Tsareff v. ManWeb Servs., Inc.*, 794 F.3d 841, 848 (7th Cir. 2015) (notice of contingent liability satisfied the notice requirement for successor liability). So all of the Transfers must be deemed improper shareholder distributions.

In the alternative, if the Court determines that only transfers made after Locker had triggered a withdrawal from the Fund are improper, the Court should enter summary judgment in favor of the Fund on Count II in the amount of $285,321.64, which is the amount of the Transfers made after Locker triggered the 2011 partial withdrawal. (SMF 23, 65, 72.) *See Hancock v. Koplos Excavating, Inc.*, No. 11 C 1428, 2013 WL 3819610, at *4 (N.D. Ill. July 23, 2013) (withdrawal liability arises when an employer withdraws from a plan); *Minneapolis Van,* 764 F.Supp. at 1296; *see also Cent. States, Se. & Sw. Areas Pension Fund v. Bomar Nat'l, Inc.,* 253 F.3d 1011, 1015 (7th Cir. 2001).

**B.     The Transfers Violated the Ohio Uniform Fraudulent Transfer Act.**

In Count III of the Complaint, the Fund alleges that all of the Transfers violated the Ohio Uniform Fraudulent Transfer Act ("UFTA"), Ohio Rev. Code § 1336, *et seq*. Under the UFTA, a transfer can be fraudulent under Ohio Rev. Code § 1336.04 or § 1336.05. Here, the Transfers were fraudulent under both provisions.

1.      **The Transfers Were Fraudulent Under Ohio Rev. Code § 1336.05.**

Under Ohio Rev. Code § 1336.05, a transfer is fraudulent as to a creditor under the following provisions:

> (A) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

> (B) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Under Ohio Rev. Code § 1336.05(A), a conveyance is fraudulent if the following elements are satisfied: (1) the creditor's claim arose before the transfer; (2) the debtor made the transfer without receiving reasonably equivalent value; and (3) the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer. The UFTA broadly defines a "claim" as including a contingent right to payment. Ohio Rev. Code § 1336.01(C). Here, Locker owed contingent withdrawal liability to the Fund that was estimated to be approximately $135,000 in 2004. (SMF 20.) So the Fund's "claim" arose before any of the Transfers. Additionally, under Ohio Rev. Code § 1336.02(A)(1) and (2), Locker was "insolvent" by 2009 because the amount of its debts exceeded the value of its assets, and Locker was incurring debts beyond its ability to pay as they became due.[5] (SMF 20-23, 33, 41, 43, 45-53, 58.) The

---

[5] According to its own Financial Statements, Locker's debts exceeded the value of its assets in 2009, 2012, and 2013. (SMF 45, 48-49.) Locker's 2010 Financial Statement lists total assets of $271,024, and total liabilities of $155,759, at the end of 2010. (SMF 46.) When the contingent withdrawal liability in the amount of $134,998 is included, Locker's debts were $290,757 ($155,759 + $134,998) as of December 31, 2010. (SMF 20, 46.) Locker's 2011 Financial Statement lists total assets of $266,428, and total liabilities of $242,424. (SMF 47.) When the

Stephenses will undoubtedly argue that Locker received "reasonably equivalent value" because it received "loans" from Gregory. However, as previously discussed, the Advances were really capital contributions, not loans. If the Advances are deemed to be equity contributions, Locker received no value for the Transfers. As such, the Transfers were fraudulent under Ohio Rev. Code § 1336.05(A).

A transfer can also be fraudulent under Ohio Rev. Code § 1336.05(B) if the following elements are satisfied: (1) the creditor's claim arose before the transfer; (2) the transfer was made to an insider for an antecedent debt; (3) the debtor was insolvent at the time of the transfer; and (4) the insider had reasonable cause to believe the debtor was insolvent. As discussed above, the Fund's "claim" arose before the Transfers and Locker was "insolvent" at the time of the Transfers. Additionally, it is undisputed that the Stephenses were "insiders" of Locker under Ohio Rev. Code § 1336.01(G)(2), and that Gregory was aware of Locker's insolvency when the Transfers were made. (SMF 12, 14-15, 20-23, 33, 41, 43, 45-52.) It is also undisputed that the Transfers were for an antecedent debt (i.e., the Advances). (SMF 53.) So the Transfers were also fraudulent pursuant to Ohio Rev. Code § 1336.05(B).

## 2. The Transfers Were Fraudulent Under Ohio Rev. Code § 1336.04.

The Transfers were also fraudulent under Ohio Rev. Code § 1336.04, which provides, in pertinent part, as follows:

> (A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before, or within a reasonable time not to exceed four years after, the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:

---

2011 Assessment is included, Locker's debts were $463,280 ($242,424 + $220,856) as of December 31, 2011. (SMF 23, 47.)

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor;

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:

> (a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;

> (b) The debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

In determining actual intent under Ohio Rev. Code § 1336.04(A)(1), the UFTA lists multiple factors that may be considered. Ohio Rev. Code § 1336.04(B). Some of the factors that are satisfied in this matter include: (1) the Transfers were made to the Stephenses who were insiders; (2) the Transfers were for substantially all of Locker's assets; (3) Locker did not receive reasonably equivalent value; (4) Locker was insolvent when the Transfers were made; and (5) the Fund's claims for the Assessments arose before or within four years of all the Transfers. (SMF 12, 14-15, 20, 23, 45-52, 62, 67, 71-72.) So the Transfers were fraudulent under Ohio Rev. Code § 1336.04(A)(1).

The Transfers can also be deemed fraudulent under Ohio Rev. Code § 1336.04(A)(2). As discussed above, Locker did not receive reasonably equivalent value in exchange for the Transfers. In addition, as a result of the Transfers, Locker had few remaining assets by the end of 2013. (SMF 49.) Moreover, Gregory knew that Locker would incur or reasonably should have believed that Locker would incur additional debts beyond its ability to pay as they became due, and Gregory had actual knowledge of Locker's potential withdrawal liability after 2004. (SMF 20-22, 33, 41, 43, 45-52.) Thus, all of the Transfers in the amount of $385,321.64 were fraudulent as to the Fund under Ohio Rev. Code § 1336.04(A)(2).

**C.      A Principal Purpose of the Transfers Was to Evade or Avoid Withdrawal Liability.**

In Count I of the Complaint, the Fund alleges that a principal purpose of the Transfers was to evade or avoid withdrawal liability. MPPAA prevents employers from attempting to "shirk their obligations" through different forms of transactions. *Chi. Truck Drivers Pension Fund v. El Paso CGP Co.*, 525 F.3d 591, 596 (7th Cir. 2008). Thus, under 29 U.S.C. § 1392(c), a transaction will be disregarded if "a principal purpose" of the transaction was to "evade or avoid liability." This provision only requires that *a* principal purpose of the transaction is to escape withdrawal liability; it does not require that evading withdrawal liability is *the* principal purpose. *Santa Fe Pac. Corp. v. Cent. States, Se. & Sw. Areas Pension Fund*, 22 F.3d 725, 727 (7th Cir. 1994). In other words, avoiding withdrawal liability "need only have been one of the factors that weighed heavily" in the thinking. *Id*. Moreover, under 29 U.S.C. § 1392(c), the statutory criterion is not whether it was a sham or fraudulent transaction. *Id*. at 729-30. Rather, the sole issue is whether a principal purpose of the transaction was to evade or avoid withdrawal liability. *Id*. at 730. In such situations, a plaintiff can reach those assets that were transferred in order to "evade or avoid liability," as well as the parties to whom they were improperly transferred. *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Ill. Range, Inc.*, 186 F.R.D. 498, 502 (N.D. Ill. 1999); *Cent. States, Se. & Sw. Areas Pension Fund v. TAS Inv. Co. LLC*, No. 11 C 2991, 2013 WL 1222042, at *12 (N.D. Ill. March 25, 2013). Here, there is sufficient evidence of a scheme to avoid paying the Assessments.

As discussed above, Locker considered withdrawing from the Fund in 2004. (SMF 19-22.) But when Locker became aware of the contingent withdrawal liability to the Fund, it decided to continue participating because it wanted to avoid paying the withdrawal liability. (SMF 21-22.) If Gregory and Locker wanted to avoid paying the withdrawal liability in 2004,

they also would have wanted to avoid paying the withdrawal liability when Locker was experiencing financial difficulties from 2008 to when it ceased operations in 2013. This is evidenced by the fact that Locker decided to fully pay all of its creditors, including unsecured creditors – except the Fund. (SMF 59-60.) After paying all of Locker's other creditors, Gregory caused Locker to make all of the Transfers even though he knew that withdrawal liability was owed to the Fund. (SMF 20-23, 59-60.) These factors demonstrate that a principal purpose of the Transfers was to evade or avoid paying the Assessments. Accordingly, this Court should enter summary judgment in favor of the Fund on Count I in the full amount of the Transfers (i.e., $385,321.64).[6]

## CONCLUSION

For the reasons discussed above, the Fund requests entry of summary judgment on Counts I through III. The Fund requests that the Transfers be voided and that a judgment be entered against the Stephenses in the amount of $385,321.64, which is the total amount of the Transfers.

Respectfully submitted,

/s/Anthony E. Napoli
Anthony E. Napoli
Attorney for Plaintiffs
9377 W. Higgins Road, 10th Floor
Rosemont, Illinois 60018-4938
(847) 939-2469
ARDC # 06210910
July 27, 2017                              tnapoli@centralstates.org

---

[6] If the Court determines that only those Transfers that occurred after Locker triggered the 2011 Partial Withdrawal violated 29 U.S.C. § 1392(c), then the Court should enter summary judgment for $285,321.64 (i.e., the Transfers after December 31, 2011). (SMF 65, 72.)

### CERTIFICATE OF SERVICE

I, Anthony E. Napoli, one of the attorneys for Plaintiffs, certify that on July 27, 2017, I electronically filed the forgoing *Plaintiffs' Memorandum in Support of Their Motion for Summary Judgment* with the Clerk of the Court using the ECF system. This filing was served on all parties indicated on the electronic filing receipt via the ECF system.

/s/ Anthony E. Napoli
Anthony E. Napoli
One of Central States' Attorneys