## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND; and ARTHUR H. BUNTE, JR., trustee, | ) ) ) ) ) | No. 15 C 10828 |
| Plaintiffs, | ) ) | Magistrate Judge Maria Valdez |
| v. | ) ) |  |
| GREGORY STEPHENS and SHERRY STEPHENS, | ) ) ) |  |
| Defendants. | ) ) ) |  |

## MEMORANDUM OPINION AND ORDER

This action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 20 U.S.C. § 1001 *et seq.*, and under Ohio's Uniform Fraudulent Transfer Act ("UFTA"), Ohio Rev. Code Ann. § 1336 *et seq.* In Count I of the complaint, Plaintiffs Central States, Southeast and Southwest Areas Pension Fund (the "Fund") and Arthur Bunte allege that certain transactions made by defendants Gregory Stephens and Sherry Stephens violate the MPPAA's evade or avoid provision; Count II alleges improper distributions; and Count III alleges violations of the UFTA. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). This matter is now before the

1

Court on Plaintiff's Motion for Summary Judgment [Doc. No. 28]. For the reasons
that follow, the motion is denied.

## FACTS[1]

The Fund is a multiemployer plan within the meaning of 29 U.S.C. §§
1002(37) and 1301(a)(3); Bunte is a present trustee and fiduciary of the Fund within
the meaning of 29 U.S.C. § 1002(21)(A), and he and his fellow trustees are the plan
sponsor of the Fund within the meaning of 29 U.S.C. § 1301(a)(10). (Pls.' LR
56.1(a)(3) ¶¶ 3-4.) The Fund is primarily funded by contributions remitted by
multiple participating employers pursuant to collective bargaining agreements
negotiated by the employers and local unions affiliated with the International
Brotherhood of Teamsters on behalf of employees of those same employers. All
principal and income from such contributions and investments thereof is held and
used for the exclusive purpose of providing pension benefits to the Fund's
participants and beneficiaries and paying the administrative expenses of the Fund.
(*Id.* ¶ 6.)   Defendants Gregory Stephens ("Gregory") and Sherry Stephens
("Sherry") are married and reside in Florida. (*Id.* ¶¶ 7-9.) Locker Moving & Storage,
Inc. ("Locker") was a corporation organized under the laws of the state of Ohio; it
was in the residential and commercial moving and storage business with operations
in Ohio and the eastern part of the United States. (*Id.* ¶¶ 10-11.) Locker was a
participating employer in the Fund, because it was a party to collective bargaining

---

[1] Unless otherwise noted, the following material facts are undisputed or are deemed
admitted due to a party's failure to comply with Local Rule 56.1, which this Court strictly
enforces. The facts are stated in the light most favorable to Plaintiff. *Bennington v.
Caterpillar Inc.,* 275 F.3d 654, 658 (7th Cir. 2001).

agreements with a certain Teamsters union pursuant to which Locker was required to make contributions to the Fund on behalf of its covered employees. (*Id.* ¶ 18.)

### *Locker's Corporate History*

From around 1985 until Locker ceased operating in 2013, Gregory was its president; he held 80% of Locker's shares and 80% of the shares' voting power. (*Id.* ¶ 12; Defs.' LR 56.1(b)(3)(B) ¶ 1.) As Locker's president, Gregory was the individual responsible for authorizing any payments made by Locker. (Pls.' LR 56.1(a)(3) ¶ 15.) From 2009 through 2013, Gregory received an annual salary in the following amounts: $123,927; $96,200; $45,630; $16,140; and $5,180. (*Id.* ¶ 64.)

The other 20% of Locker was owned by Kenneth Keller, who had no active role in the company's operations but would talk about company business with Gregory when Gregory was in town. (*Id.* ¶ 13; Defs.' LR 56.1(b)(3)(B) ¶ 2.) Sherry was Locker's secretary, and she worked at Locker when office or sales staff went on vacation. (Pls.' LR 56.1(a)(3) ¶ 14; Defs.' LR 56.1(b)(3)(B) ¶ 27.) Around 2009-2010, Defendants moved from Ohio to Florida, and thereafter Gregory operated Locker remotely from Florida. (Pls.' LR 56.1(a)(3) ¶ 16.)

In 2008, Locker sold real property and self-storage units it owned at 5808 Fulton Rd. in Canton, Ohio for $960,000 in cash and a promissory note for $240,000 (the "Fulton Note"). Gregory testified that the property was probably sold to reduce Locker's debt at the request of its bank. (*Id.* ¶¶ 40-41.) On or around May 26, 2010, Locker sold real property and self-storage units it owned at 131 Perry Dr. N.W., Canton, Ohio, for $620,000. Locker was forced to sell that property because its

secured lender required Locker to pay off all remaining debt owed to the lender. (Pls.' LR 56.1(a)(3) ¶¶ 42-43.) The net proceeds of both property sales were used to fund Locker's ongoing operations. (*Id.* ¶ 44.)

Locker's 2009 Federal Tax Return states that Locker had gross receipts or sales of $1,038,060 in 2009; Locker's 2010 Financial Statement shows that Locker had a net loss from operations of $42,307 in 2009 and $599,900 in assets. (*Id.* ¶¶ 34-35, 45.) In 2010, Locker's gross receipts were $587,634, with a net loss from operations of $199,168; in 2011, gross receipts were $350,330, with a net loss from operations of $107,058; in 2012, gross receipts were $306,124, with a net loss from operations of $70,452; and in 2013, gross receipts were $258,339, with a net loss from operations of $40,619. (*Id.* ¶¶ 36-39.)

Up until 2009, Locker had a line of credit with Charter Bank that it used on a regular basis. (Defs.' LR 56.1(b)(3)(B) ¶ 7.) As Locker's sales declined, it was unable to maintain the financial arrangement, and the line of credit was discontinued in 2009. (*Id.* ¶ 8.) During the years 2008 to 2013, Locker also could not obtain financing from other banks or financial institutions. As a result, Gregory advanced monies to Locker to keep the company operating; the parties dispute whether those funds were given as loans or capital contributions. (Pls.' LR 56.1(a)(3) ¶ 52; Defs.' LR 56.1(b)(3)(B) ¶¶ 8, 10.) The money came from a second mortgage on Gregory's home. (Defs.' LR 56.1(b)(3)(B) ¶ 8.) In 2009, Gregory gave Locker $75,000 in multiple amounts during the year. (*Id.* ¶ 9.)

The money was used by Locker for ongoing expenses, such as paying bills and employees, and not to purchase capital assets. (Pls.' LR 56.1(a)(3) ¶ 58; Defs.' LR 56.1(b)(3)(B) ¶ 29.) Gregory's shares in the company never increased in value as a result of the money he paid to Locker. (Defs.' LR 56.1(b)(3)(B) ¶ 4.) With regard to the money given by Gregory to Locker, there were no loan documents executed, but "Loan" was written on the checks. (Pls.' LR 56.1(a)(3) ¶ 54; Defs.' LR 56.1(a) ¶ 55; Defs.' LR 56.1(b)(3)(B) ¶ 11.) There also was no schedule for repayment or maturity date given. (Pls.' LR 56.1(a)(3) ¶ 55.) Interest accrued on the funds, but it was deferred and not was actually paid to Gregory in order to avoid the tax consequences of payment. (*Id.* ¶ 56; Defs.' LR 56.1(b)(3)(B) ¶ 13.) Locker's tax returns from 2009 to 2013 identified the funds as shareholder loans. (Defs.' LR 56.1(b)(3)(B) ¶ 14.)

Gregory's intention was to be repaid when Locker's business improved. (Pls.' LR 56.1(a)(3) ¶ 57.) Locker did not set up a sinking fund to repay Gregory, but it did set aside money as it became available and made occasional cash transfers to him. (Defs.' LR 56.1(b)(3)(B) ¶ 12.) According to Gregory, he had loaned money to Locker on numerous occasions between 1985 and 2012, and Locker paid him back in an ongoing and regular fashion, in the normal course of Locker's business operations. (*Id.* ¶¶ 3, 5.) Locker would generally pay other creditors ahead of repaying Gregory. (Pls.' LR 56.1(a)(3) ¶ 59.) Locker's accountant, Jeffrey Sherritt, testified that Locker

repaid certain amounts to Gregory throughout the years 2010 to 2013.[2] (*Id.* ¶ 65.) Gregory was never fully repaid all the money he gave to Locker. (*Id.* ¶ 60.)

On or around June 26, 2012, Locker authorized the assignment or transfer of the 2008 Fulton Note to Gregory. (*Id.* ¶ 66.) In conjunction with the assignment, Locker's Board of Directors acknowledged the company's indebtedness to Gregory. (Defs.' LR 56.1(b)(3)(B) ¶ 15). Approximately two days later, Locker executed an Assignment and Indorsement of the Fulton Note to Gregory and Sherry, as Trustees of the Sherry L. Stevens Revocable Trust (the "Sherry Trust") dated September 20, 1997 (the "Assignment"). (Pls.' LR 56.1(a)(3) ¶ 67.) The Sherry Trust is a revocable trust established by Sherry; Gregory and Sherry are the Trustees, Sherry is the primary beneficiary, and Gregory is a secondary beneficiary. (*Id.* ¶ 68.) Gregory testified that Locker transferred the Fulton Note to the Sherry Trust because the trust held the title to Defendants' home residence, and they had obtained a home equity loan to make the advances or loans to Locker. (*Id.* ¶ 69.)

At the time of the Assignment, the principal amount remaining due on the Fulton Note was $231,313.08. (*Id.* ¶ 70.) Repayment on the Fulton Note was not dependent on Locker's financial success, as it was being paid back by a debtor

---

[2] Plaintiffs allege that Locker paid to Gregory a total of $149,500, citing to a portion of Sherritt's testimony where he read numbers from an exhibit entitled "Locker Moving & Storage General Ledger." (Pls.' LR 56.1(a)(3), Ex. 34.) Defendants object to the exhibit and testimony on hearsay grounds. The Court agrees that Plaintiffs have failed to lay a proper foundation for this exhibit. Sherritt's testimony establishes that the ledger was created by his firm, not by Defendants, and he did not specify exactly what information goes into the ledger, stating only that "[t]here would have been documents which the client would have provided, books or records of some sort." (*Id.*, Ex. F, at 32:15-17.) He further testified that some of the early entries would have been made by Defendants' previous accountant, who may have originally created the ledger document and given Sherritt a copy, but he was "not sure" and could not recall the document's origin. (*Id.* at 36:12-20.)

rather than Locker. (Defs.' LR 56.1(b)(3)(B) ¶ 16.) Defendants ultimately received

payments totaling $235,821.64 – $226,674.08 in principal and $12,147.56 in interest

– on the Fulton Note from 2012 to February 20, 2014. (Pls.' LR 56.1(a)(3) ¶¶ 71-72.)

On Defendants' 2014 tax return, they recognized a capital loss in the amount of

$7,639, representing the remaining unpaid principal balance on the Fulton Note.

On or around March 30, 2013, Locker sold certain assets to Lytle Transfer

and Storage for $30,000, and around July 19, 2013, Locker sold all of its remaining

assets to The Cotter Moving and Storage Company for $52,500, and ceased

operations. (*Id.* ¶¶ 17, 62-63.)

### *Locker's History with the Fund*

In 2004, Gregory asked the Fund to provide an estimate of Locker's

withdrawal liability, because the company was considering withdrawing from the

Fund. (*Id.* ¶ 19.) According to Gregory, he wanted to explore providing a 401(k) plan

instead of the Fund's pension plan. (Defs.' LR 56.1(b)(3)(B) ¶ 29.) In a letter dated

March 29, 2004, the Fund informed Locker that it would be charged money if it

were to withdraw, and the estimated amount of withdrawal liability to the Fund

was $95,423.08. (Pls.' LR 56.1(a)(3) ¶ 20; Defs.' LR 56.1(b)(3)(B) ¶ 21.) In a

subsequent letter dated October 18, 2004, the Fund informed Locker that its

estimated withdrawal liability was $134,998.20. (Pls.' LR 56.1(a)(3) ¶ 20.) Locker

ultimately elected to remain in the Fund, because the withdrawal amount was so

large that it would not be cost-effective to switch to a 401(k) plan. (*Id.* ¶ 21; Defs.'

LR 56.1(b)(3)(B) ¶ 22.) Pursuant to the March and October letters, Locker and

Gregory had knowledge of Locker's potential withdrawal liability to the Fund in 2004. (Pls.' LR 56.1(a)(3) ¶ 22.) However, Locker did not have any further contact or discussions with the Fund in relation to actual or potential withdrawal from 2004 to 2013. (Defs.' LR 56.1(b)(3)(B) ¶¶ 23-25.)

Because of a decline in Locker's contributions to the Fund in 2011, Locker effected a "partial withdrawal" from the Fund as defined in 29 U.S.C. § 1385(a)(1) (the "2011 Partial Withdrawal"), and as a result, Locker incurred withdrawal liability to the Fund in the principal amount of $220,856.52, as determined under 29 U.S.C. § 1381(b) (the "2011 Assessment"). (Pls.' LR 56.1(a)(3) ¶ 23.) On or around May 16, 2013, Locker first received a notice and demand for payment of the 2011 Assessment issued by the Fund in accordance with 29 U.S.C. §§ 1382(2) and 1399(b)(1) (the "2011 Notice"). The 2011 Notice and attached invoices notified Locker that it was required to discharge its liability in a lump sum payment of $220,856.52 by June 1, 2013, or in monthly installments of $1,237.93 commencing on June 1, 2013. (*Id.* ¶ 24; Defs.' LR 56.1(b)(3)(B) ¶¶ 17, 24.) Gregory asked the Fund why he received the 2011 Notice, since Locker had never asked to withdraw from the Fund, had not advised the Fund that it was shutting down, and had been paying contributions regularly. (Defs.' LR 56.1(b)(3)(B) ¶¶ 18-19.)

Following a further decline Locker's contributions to the Fund, on December 31, 2012, Locker effected another "partial withdrawal" from the Fund (the "2012 Partial Withdrawal"). As a result of the 2012 Partial Withdrawal, Locker incurred withdrawal liability to the Fund in the principal amount of $227,749.54 (the "2012

Assessment"). (Pls.' LR 56.1(a)(3) ¶ 25.) On or about December 6, 2013, Locker

received a notice and demand for payment of the 2012 Assessment issued by the

Fund (the "2012 Notice"). The 2012 Notice demanded full payment of the entire

amount of the 2012 Assessment by December 15, 2013. The amount demanded was

$227,749.54, the balance owed at that time on the 2012 Assessment. (*Id.* ¶ 26.)

On or around July 6, 2013, Locker permanently ceased to have an obligation

to contribute to the Fund and/or permanently ceased all covered operations, thereby

effecting a "complete withdrawal" from the Fund within the meaning of 29 U.S.C. §

1383 (the "2013 Complete Withdrawal"). As a result of the 2013 Complete

Withdrawal, Locker incurred withdrawal liability to the Fund in the principal

amount of $76,486.98 (the "2013 Assessment"). (*Id.* ¶ 27.) On or about December 6,

2013, Locker received a notice and demand for payment of the 2013 Assessment

issued by the Fund (the "2013 Notice"). The 2013 Notice demanded full payment of

the entire amount of the 2013 Assessment by December 15, 2013. The amount

demanded was $76,486.98, the balance owed at that time on the 2013 Assessment.

(*Id.* ¶ 28.)

On January 30, 2014, the Fund filed a lawsuit against Locker in the United

States District Court for the Northern District of Illinois to collect the 2011

Assessment, the 2012 Assessment and the 2013 Assessment (collectively the

"Assessments"), plus interest and statutory damages. The case was entitled *Central

States, Southeast and Southwest Areas Pension Fund, et al., v. Locker Moving and

Storage, Inc.*, No. 14 C 667. (*Id.* ¶ 29.) On August 19, 2014, a consent judgment was

entered in that case in favor of the Fund and against Locker in the total amount of $641,887.63, plus post-judgment interest. The entire amount of the judgment remains due and owing to the Fund. (*Id.* ¶¶ 30-31.)

**DISCUSSION**

## I.  LEGAL STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must draw all reasonable inferences in favor of the nonmovant. *Bennington v. Caterpillar Inc.,* 275 F.3d 654, 658 (7th Cir. 2001).

However, once the movant has carried its burden under Rule 56(c), "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The party opposing summary judgment must offer admissible evidence in support of his version of events, and hearsay evidence does not create a genuine issue of material fact. *McKenzie v. Ill. Dep't of Transp.,* 92 F.3d 473, 484 (7th Cir. 1996); *see Larimer v. Dayton Hudson Corp.,* 137 F.3d 497, 500 (7th Cir. 1998) ("'If the non-moving party bears the burden of proof on an issue, . . . that party may not rest on the pleadings and must instead show that there is a genuine issue of material fact.'") (citation omitted). "The mere existence of an alleged factual dispute is not sufficient to defeat a summary judgment motion. . . . The nonmovant

will successfully oppose summary judgment only when it presents 'definite, competent evidence to rebut the motion.'" *Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002) (citations omitted); *see also Hall v. Bodine Elec. Co.,* 276 F.3d 345, 354 (7th Cir. 2002) ("Conclusory allegations and self-serving affidavits, without support in the record, do not create a triable issue of fact.").

"[S]ummary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson*, 325 F.3d at 901 (citation and internal quotations omitted). "In considering a motion for summary judgment, this court is not required to scour the record in search of evidence to defeat the motion; the nonmoving party must identify with reasonable particularity the evidence upon which the party relies." *Pleniceanu v. Brown Printing Co.*, No. 05 C 5675, 2007 WL 781726, at *7 (N.D. Ill. Mar. 12, 2007) (citing *Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892, 898 (7th Cir. 2003)); *see Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005). Finally, the Court is "'not required to draw every conceivable inference from the record.'" *McCoy v. Harrison,* 341 F.3d 600, 604 (7th Cir. 2003) (citation omitted).

## II.   ANALYSIS

Plaintiffs argue that summary judgment should be granted on Count II because the advances were capital contributions, not loans, and thus Defendants received improper shareholder distributions; on Count III because the transfers

violated the UFTA; and on Count I because the transfers were made for the purpose of avoiding withdrawal liability.

### A.  Count II – Improper Distributions

In Count II, Plaintiffs allege that Defendants received improper shareholder distributions from Locker, and those distributions were in preference to creditors including the Fund. Plaintiffs claim that as a result of the Locker Distributions, Locker became unable to pay its debts and/or became insolvent; and Plaintiff further alleges that the Locker Distributions were an abuse of Locker's assets and corporate form, and thus Defendants are liable to Plaintiff in the amount of the improper distributions.

The parties do not dispute the general notion that in corporate law, "[w]hen the assets of a corporation are distributed to its shareholders leaving corporate debts unpaid, liability of the shareholders to a creditor, to the extent of the value of the assets received is beyond question." *Cent. States, S.E. & S.W. Areas Pen. Fund v. Minn. Van & Whse. Co.*, 764 F. Supp. 1289, 1294 (N.D. Ill. 1991); *see also Cent. States, S.E. & S.W. Areas Pen. Fund v. Cardwell*, No. 2014 WL 2568471, at *4 (N.D. Ill. June 6, 2014) ("It is of course black letter law . . . that on dissolution of a corporation its stockholders are entitled to receive only the remaining equity in their corporation, bearing personal responsibility to the corporate creditors for any corporate liabilities that should have been satisfied before the distribution of assets on dissolution.").

Plaintiffs contend that the monies Locker transferred to Gregory from 2010 to 2013 were improper distributions, because he was paid before all of Locker's creditors, *i.e.*, Plaintiffs, were paid. The fundamental question is whether the funds Gregory originally gave to Locker were loans or capital contributions. If they were loans, then it would not be improper for Locker to pay Gregory, a corporate creditor, as Locker wound up its operations. If, on the other hand, the funds were capital contributions, then any subsequent payments Locker made to him would be considered improper shareholder distributions.

In determining whether Gregory's transfers to Locker were loans or capital contributions, Plaintiffs urge the Court to follow the factors enumerated in *Roth Steel Tube Co. v. Comm'r of Internal Revenue*, 800 F.2d 625, 630 (6th Cir. 1986) ("The determination . . . depends on whether the objective facts establish an intention to create an unconditional obligation to repay the advances.").[3] Those factors include: (1) the names of the instruments evidencing the debt; (2) whether there were maturity dates and payment schedules; (3) whether there was a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and stockholder; (7) whether there was any security for the advances; (8) the corporation's ability to obtain financing from outside institutions; (9) the extent

___

[3] Although the *Roth Steel* factors have not been explicitly adopted by the Seventh Circuit, the case has been cited favorably. *See Price v. Comm'r of Internal Revenue*, No. 97-2842, 1998 WL 234520, at *2 (7th Cir. May 6, 1998) (unpublished decision); *Frierdich v. Comm'r of Internal Revenue*, 925 F.2d 180, 183 (7th Cir. 1991); *Matter of Larson*, 862 F.2d 112, 116-17 (7th Cir. 1988); *see also Cent. States, S.E. & S.W. Areas Pen. Fund v. Dizack*, No. 16 C 3315, 2018 WL 1087640, at *2 (N.D. Ill. Feb. 28, 2018) (noting that the Seventh Circuit and courts in this district have applied the *Roth Steel* factors).

to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments. *Id*.

Plaintiffs argue that the factors weigh in favor of a finding that the advances were capital contributions because: (1) they were not documented with promissory notes or security agreements; (2) there was no fixed maturity date or schedule of payments; (3) there was no fixed rate of interest or payment of interest; (4) Gregory expected to be repaid only when Locker had cash available to do so; (5) Locker was inadequately capitalized at the time the advances were made; (6) Gregory was Locker's majority shareholder and principal officer, and Keller was not active in Locker's operations, giving Gregory the opportunity and means to contrive fictional debt; (7) no security was provided; (8) Locker was not able to obtain financing from outside lending institutions; (9) Gregory subordinated his claim to other creditors, who were paid ahead of him when Locker ceased operations; and (10) Locker did not establish a sinking fund for the purpose of paying off the advances to Gregory.

Plaintiffs are correct that many of the *Roth Steel* factors seems to weigh in favor of a finding that Gregory's payments to Locker were in fact capital contributions. However, the Court need not engage in a factor-by-factor analysis, weighing the evidence on either side, because it is clear there are disputed issues of material fact with regard to several of the factors. Plaintiffs' own brief admits that the advances were not used to acquire capital assets, but rather pay outstanding bills and for ongoing operations, and that "[t]his factor weighs in favor of debt."

(Pls.' Mem. at 9.) In addition, with regard to inadequate capitalization, Plaintiffs acknowledge that "the exact calculation of Locker's assets and liabilities as of each of the dates of the advances are unknown." (*Id.* at 8.) Furthermore, the accountant Sherritt testified that the company "[a]ppear[ed] to be well-capitalized" at the time it filed its 2010 tax return. (Pls.' LR 56.1(a)(3), Ex. F, at 27:24.) Accordingly, it would be improper to find as a matter of law that Locker was inadequately capitalized during the relevant time frame. Defendants also dispute that the loans were undocumented, as the notation "Loan" was written on the face of the checks, and the indebtedness was formally acknowledged by the corporation in the 2012 Assignment as well as Locker's tax returns in 2009 to 2013. Defendants also point out that interest was accrued although not paid; and Gregory was not the sole owner or officer of the company.

Although Plaintiffs have shown a number of reasons for which a jury could find that the advances were capital contributions, and thus the transfers were improper, they have failed to establish that a jury is required to reach this conclusion. On the facts in the record, a reasonable trier of fact could instead find that the funds were intended to be repaid as loans. Because there are too many disputed issues of material fact, summary judgment must be denied. *See Cent. States, S.E. & S.W. Areas Pen. Fund v. Dizack*, No. 16 C 3315, 2018 WL 1087640, at *4 (N.D. Ill. Feb. 28, 2018) (concluding that although "the scales tilt toward capital contributions, . . . this inquiry is simply too fact-intensive, and the record too

disputed, equivocal, and sometimes sparse to warrant summary judgment finding as much").

## B.    <u>Count III – Ohio's Uniform Fraudulent Transfer Act[4]</u>

Plaintiffs argue that the payments to Defendants violated two provisions of the Ohio UFTA, Ohio Rev. Code Ann. § 1336 *et seq. See Stein v. Brown*, 480 N.E.2d 1121, 1124 (Ohio 1985) ("The burden of proof in an action to set aside a fraudulent conveyance must be affirmatively satisfied by the complainant."). Pursuant to § 1336.05 of the UFTA:

> (A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

> (B) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the transfer was made to or the obligation was incurred with respect to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Ohio Rev. Code Ann. § 1336.05.

Plaintiffs argue that the statutory definition of "claim," which is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured," Ohio Rev. Code Ann. § 1336.01, applies to Locker's $135,000

---

[4] The parties agree that the law of Ohio, where Locker was incorporated, applies to the state law claim. *See Cent. States, S.E. & S.W. Areas Pen. Fund v. Minn. Van & Whse. Co.*, 764 F. Supp. 1289, 1294 n.9 (N.D. Ill. 1991).

contingent withdrawal liability to the Fund as of 2004, which was before the transfers were made. Plaintiffs further conclude that Locker was insolvent by 2009, because the amount of its debts exceeded the value of its assets; and Locker did not receive reasonably equivalent value if the advances are deemed to be capital contributions rather than loans.

First, Plaintiffs have not explained how the 2004 estimate of withdrawal liability created a claim, contingent or otherwise. That estimate was triggered by Locker's inquiry about the effect of leaving the Fund, not by any other action or inaction of Locker. It appears that whenever any Fund participant chooses to stop participating, the Fund requires the payment of withdrawal liability. Accordingly, that abstract obligation exists from the inception of a company's participation in the Fund, whether or not the participant has a present intention to withdraw. Plaintiffs, however, do not maintain that this theoretical liability created a contingent claim; instead, they contend that it was created by the 2004 estimate. What remains unclear is how the mere act of reducing the cost of withdrawing from the Fund to a written estimate, without more, created a claim.

Second, Plaintiffs have not offered undisputed facts supporting their claims that Locker was insolvent during the relevant time period. For the years 2009 and 2011-2013, the Court cannot discern the truth or accuracy of Plaintiffs' contentions about assets and liabilities from the cited exhibits. For 2010, Plaintiffs added to Locker's liabilities the nearly $135,000 in contingent withdrawal liability. As explained above, it is not certain as a matter of law that the contingent withdrawal

liability created any sort of a claim. But to the extent a claim was created, Plaintiffs have not offered case law supporting their solvency calculations. Because by definition a contingent liability may not become an actual liability, in valuing the contingent liability, "it is necessary to discount it by the probability that the contingency will occur and the liability become real." *Matter of Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir. 1988). Finally, as explained above, whether the funds Gregory paid to Locker were capital contributions or loans is a question for the jury.

Plaintiffs also argue fraudulent transfer under a different section of the UFTA. Section 1336.04 provides that:

> (A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before, or within a reasonable time not to exceed four years after, the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:

>> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor;

>> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:

>>> (a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;

>>> (b) The debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Ohio Rev. Code Ann. § 1336.04 (2013).

Subsection (B) of the statute enumerates a non-exclusive list of eleven factors that may be considered in determining actual intent under subsection (A)(1), and Plaintiffs argue that five of them are satisfied, thus demonstrating the transfers were fraudulent. As an initial matter, it should be noted that three of the five factors relate to disputed issues of fact discussed above: whether the transfers were to repay loans or capital contributions; whether Locker was insolvent at the time the transfers were made; and whether the transfers occurred around the time Locker incurred a debt to Plaintiffs. But more significantly, the fact that Plaintiffs did not even discuss the remaining enumerated factors is telling. Many of those factors fall in Defendants' favor, demonstrating that summary judgment is inappropriate. *See* Ohio Rev. Code Ann. § 1336.04(B) (listing other factors, including whether the transfer was concealed, whether the debtor absconded, whether the debtor retained possession or control of transferred property, and whether the debtor had been sued prior to the transfer); *see also Stein*, 480 N.E.2d at 1124 ("It is rudimentary that the issue concerning fraudulent intent is to be determined in view of the facts and circumstances of each case.").

### C.  <u>Count I – Under MPPAA's Evade or Avoid Provision</u>

Finally, Plaintiffs argue that the transfers should be disregarded under 29 U.S.C. § 1392(c), which provides that a party's obligation to contribute to a pension fund shall be applied without regard to any transactions whose "principal purpose . . . is to evade or avoid liability." *See Santa Fe Pac. Corp. v. Cent. States, S.E. & S.W. Areas Pen. Fund*, 22 F.3d 725, 727 (7th Cir. 1994) (explaining that avoiding

withdrawal liability "needn't be the only purpose; it need only have been one of the factors that weighed heavily in the seller's thinking").

According to Plaintiffs, Locker considered withdrawing from the Fund in 2004 but decided to continue participating because it wanted to avoid paying the withdrawal liability. Plaintiffs extrapolate from Locker's 2004 decision that "they also would have wanted to avoid paying the withdrawal liability when Locker was experiencing financial difficulties from 2008 two when it ceased operations in 2013." (Pls.' Mem. at 15.) Plaintiffs contend that the unlawful purpose of the transfers is proved by evidence that Locker paid all of its creditors except the Fund, and Locker paid Gregory even though withdrawal liability was still owing to the Fund.

Plaintiffs may well be correct that a jury will find that the money was transferred to Gregory in order to avoid paying the Fund. Plaintiffs' argument, however, relies on a chain of inferences in their favor, which is improper on summary judgment. Plaintiffs' cited evidence proves only that the effect of the transfers was the avoidance of withdrawal liability, not that avoidance of liability played any part in the transfer decisions. A reasonable jury could find that the transfers, all or most of which predated the Fund's June and December 2013 notices to Locker for the 2011, 2012, and 2013 Assessments, were not related to withdrawal liability. Accordingly, summary judgment must be denied.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's Motion for Summary Judgment [Doc.
No. 28] is denied.

**SO ORDERED.**                    **ENTERED:**

**DATE:**      **April 2, 2018**      _____
                                     **HON. MARIA VALDEZ**
                                     **United States Magistrate Judge**